**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Jonathan Gersten**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| DELANEY MILLAR-GRIFFIN, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF PORTLAND, and BRENT TAYLOR, <br><br> Defendants. | Case No. 3:22-cv-1201 <br><br> COMPLAINT <br><br> Civil Rights Action (42 U.S.C. § 1983) <br><br> JURY TRIAL DEMANDED |

    On August 16, 2020, Delaney Millar-Griffin, Plaintiff, was out on the streets protesting the killing of Black people by United States police departments, including the Portland Police Bureau. In response, Portland Police Officer Defendant Brent Taylor attacked Plaintiff and pepper sprayed them in the face. Defendant Taylor did this after watching Plaintiff get thrown to the ground by several other Portland Police Officers with so much force that they broke their arm. This action by Defendant Brent Taylor maintains a pattern and practice of the City of Portland of unlawfully punishing groups that express sentiments in support of police accountability or against white supremacy.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the State tort claims pursuant to 28 U.S. Code § 1367(a).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Delaney Millar-Griffin, Plaintiff, is a citizen of the State of Oregon.

4. Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau (hereinafter, "PPB").

5. Defendant Brent Taylor is a Portland Police Officer. At all times relevant, Defendant Taylor was at all times relevant acting under color of law. He is sued in his personal capacity.

## FACTUAL ALLEGATIONS

### I. Introduction: Black Lives Matter.

6. The disproportionate and excessive use of force against Black people by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB.

7. For many years, advocates and activists have attempted, largely unsuccessfully, to get the City to address and reduce the Portland Police Bureau's disproportionate use of force, stops,

searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite all the recommendations, implemented or more often, not, PPB continues to engage in disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

8. On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

9. For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

10. Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them,

---

[1] https://www.portlandoregon.gov/police/article/32381

COMPLAINT
Page 3 of 19

driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas and impact weapons in a systemic effort to stop people from protesting police violence. This violent police response has only strengthened the resolve of protesters.

11.    Beginning on May 29, 2020, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. The PPB, like police departments throughout the country, have met these demands with violence.

12.    On June 23, 2021, Mayor Ted Wheeler, who in addition to being the chief executive for the City of Portland is also the PPB's commissioner-in-charge, articulated this policy succinctly as wanting protesters to "hurt."[2]

### III. PPB's Pattern and Practice of Targeting Police Accountability Protesters

13.    On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17, 2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting concrete barriers around the site of the rally, and placing a heavily armed police presence

---

[2] Aaron Mesh, *Portland Mayor Wants Reed College to Expel Student If He's Convicted of Smashing Downtown Windows*, Willamette Week (April 23, 2021), https://www.wweek.com/news/city/2021/04/23/portland-mayor-wants-reed-college-to-expel-student-if-hes-convicted-of-smashing-downtown-windows/

between the fascist rally and counter protesters. After the far-right rally in Tom McCall Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counter protesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

14. Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepper-spray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members. Tusitala "Tiny" Toese, who had an outstanding warrant for his arrest, was present, seen, and identified by Defendants, but not arrested. In contrast, PPB members arrested Demetria Hester, a Black Lives Matter leader, less than two weeks prior.

15. Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy

police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

### IV. PPB's Pattern and Practice of Illegal Use of Force at Protests

16. PPB has a policy or practice of using force without individualized justification to disperse protestors. From May 30, 2020 and onwards, PPB regularly used force consistent with this policy and practice against people like Plaintiff, *i.e.*, without individualized justification to use force. This policy and practice existed to punish people like Plaintiff who wanted to call attention to PPB's rampant lawlessness and violence against the public.

17. Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020 that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders, such as John Does 2-10, at the scene.

18. Nearly a year after protests began, PPB has failed to accurately document or evaluate its officers' use of force against protesters. PPB, including John Does 1-10, has demonstrated that it does not take criticisms of its use of force seriously, and it is unwilling or unable to honestly assess, much less ameliorate, its pattern and practice of unconstitutional use of force against protesters without outside orders or supervision.

19. In an evaluation of PPB's after-action reports (AARs) and other Bureau documentation reviewing and assessing its response to protests between May 29 to November 15, 2020, the attorneys in the U.S. Department of Justice Civil Rights Division ("USDOJ") stated that "PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB

focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own."

20. PPB broadly portrays all force as justified and evaluated itself as doing an excellent job handling the nightly protest.

21. PPB has a pattern of misusing the phrase "active aggression" to justify force against individuals who engaged in passive resistance or merely failed to disperse. This includes people otherwise complying with orders to disperse but not doing so at the desired and unreasonable pace of PPB.

22. PPB did not track an inventory of munitions or make a daily count of the type and amount of force used against individuals for most of the summer of 2020.

23. PPB did not assess whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. In its evaluation of use of force at protests, PPB supervisors focus on the articulation of members' justifications for using force, rather than whether a particular use of force was justified.

24. PPB has failed to issue use of force warnings to individuals, or confirm that subjects heard use of force warnings, before using force on protesters.

25. The PPB supervisors assigned to complete AARs had little to no crowd management training.

26. PPB has failed to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification.

27. PPB scheduled a Rapid Response Team (RRT) training for April, 2021, and only created lesson plans for parts of the training after USDOJ requested copies. PPB ended up cancelling this

training because the materials and outlines were insufficient to meet the USDOJ's required standards.

28. PPB treated the failure to disperse as sufficient justification, in and of itself, to use force against protesters. PPB did not engage in individualized assessments of the reasonableness of a particular use of force against a particular person, as required by their PPB Directive 1010. Instead, the officers on the ground and their supervising officers believed that a mere failure to disperse, which is only passive resistance, was sufficient to justify the use of indiscriminate force. This unconstitutional policy is justified, in part, by a different directive, PPB Directive 635.10.

29. As USDOJ noted in their June 30, 2022 compliance report, "In force reviews covered by these investigations, PPB officers and executives repeatedly noted that PPB's Rapid Response Team (RRT) members were trained that they need not follow Directive 1010.00, *because they were authorized to use greater force under Directive 635.10*."[3] (Emphasis added.) Later in their report, USDOJ continues: "PPB has repeatedly asserted that RRT training instructed members that they could use force based on PPB's Directive 635.10, without following the requirements of Directive 1010.00."[4]

30. As the USDOJ also noted in the June 30, 2022 report, even when the Bureau does acknowledge the issues with its training and directives, that is not reflected in disciplinary outcomes:

> "[T]he City failed to identify misconduct in several cases and did not hold any supervisors responsible for their conduct. In the accountability process we continued to see PPB members from line officers to deputy chiefs conflate the actions of the crowd generally with the individual justification required for each separate application of force. When the City reaches a sustained finding, it

---

[3] *United States v. City of Portland*, USDC of Or. Case No. 3:12-cv-02265-SI (2012), Dkt. 292-1, p. 4.
[4] *Id.* at p. 25.

> does not necessarily impose the applicable discipline. Seven times during this compliance period, the City voluntarily resolved grievances of imposed discipline by agreeing that the 'discipline be rescinded' and 'that all references of this matter be removed from [the Grievant's] personnel file.'"[5]

31. The Bureau continues to solidify the view amongst its ranks that the public, courts, and DOJ have all been wrong to criticize its tactics and actions during the 2020 Movement for Black lives. In a self-audit, "PPB gave itself an overall compliance rate of 96%. Even ignoring force policy requirements and assessing only the reporting requirements of crowd control policy, as PPB designed its audit to do, a 96% compliance rate is inconsistent with the City's acknowledgement that it did not complete timely AARs or conduct full interviews and investigations of force during the 2020 protests."[6] In private "procedural justice" trainings, the City continues to tell its own officers that "99% of the time we did [crowd control] well.'"[7]

32. Ultimately, almost one year after the death of George Floyd, Defendant has failed to acknowledge "the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations." Since May 31, 2020, the City has increased its inventory of crowd control weaponry for use against demonstrators.

33. Defendant City has demonstrated that it will without remorse continue to enforce its unlawful pattern and practice.

## V. Court Orders and Contempt

34. As a result of PPB's lawless uses of force against protesters, Federal and State Courts in Oregon have used their remedial powers to restrain PPB's excesses.

---

[5] *Id.* at p. 58.
[6] *Id.* at p. 22.
[7] *Id.* at p. 31.

35.     The case *Don't Shoot Portland, et al v. City of Portland*, Or. Dist. Case No. 3:20-cv-00917-HZ, was filed on June 6, 2020 directly in response to the opening days of mass police violence in the wake of George Floyd's murder. The Plaintiffs sought and received an injunction placing limits on police use of force at protests shortly after filing their case. The Court later found that PPB's conduct on June 30, 2020, violated the Court's order—specifically owing to the use of force that targeted protesters who were not actively aggressive.

36.     Through the *Don't Shoot* litigation, the public learned that PPB had trained their riot police with incorrect use of force standards. PPB training documents included the citation of an opinion overruled by *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002). The materials alsoincorrectly described protesters who walked slowly as "actively aggressive." One training concluded with a slide that caricatured police accountability protesters and advocated for violence against them.



37.     The case *Index Newspapers LLC, et al v. US Marshals Serv., US DHS, and City of Portland*, Or. Dist. Court Case 3:20-cv-01035-SI was filed on June 28, 2020. The Plaintiffs were non-protesters who were passively observing protests—members of the media, legal observers—

who were nonetheless targeted for injury and/or dispersal by PPB. The Court enjoined PPB from this practice.

38. The case *ACLU & Protestor #1 v. City of Portland*, Mult. Co. Cir. Case No. 20CV27116 was filed in July 2020 after it became apparent PPB had been violating ORS 181A.250. ORS 181A.250 prevents law enforcement from surveilling people based on their political activities. The State court enjoined PPB from this practice in September 2020.

39. As partly discussed above, the United States Department of Justice has maintained a quasi-consent decree against the Portland Police Bureau because of its pattern and practice of using excessive force against people with mental illness. *United States v. City of Portland*, Or. Dist. Case No. 3:12-cv-02265-SI. Part of the City of Portland's obligations under its settlement agreement with the USDOJ, PPB had to maintain records regarding its use of force and comply with the U.S. Constitution. The USDOJ found PPB in violation with the settlement agreement owing to its actions in 2020 and has sought remedial sanctions against the City of Portland.

40. As described in the preceding paragraphs, numerous courts have found that PPB has violated the law on multiple occasions—acutely so in the summer of 2020, when they injured Plaintiff.

## VI. August 15-16, 2020

41. In the late evening and early morning of August 15 to 16, 2020, at least a hundred individuals assembled outside the Penumbra Kelly Building. Portland Police Bureau ("PPB") Officers lined the perimeter of the Penumbra Kelly Building. These officers were wearing full tactical gear and appeared ready to fight the crowd, and announced themselves as the Portland Police Bureau.

42. On countless night prior, Plaintiff had witnessed the same heavily armored, aggressive police force escalate tensions at protests, then use the escalation as an opportunity to attack and injure protesters.

43. Plaintiff was present as was their fiancé, now spouse.

44. Just after midnight, at around 12:01 am on August 16, 2020, PPB charged a line of protesters, jumping into them and dispersing them with force.

45. Plaintiff believed that PPB was assaulting their fiancé on the ground and ran to defend their spouse.

46. Plaintiff is of small stature and low weight. Several Portland Police officers grabbed Plaintiff, dragged them by their bike helmet, and threw them with enough force to break their arm.

47. Plaintiff was in pain, disoriented, and still fearful that their fiancé was getting hurt. At this point, no reasonable officer would believe that Plaintiff posed a serious threat of injury to anyone, let alone a heavily armed, heavily armored police officer.

48. Defendant Brent Taylor honed in on the injured Plaintiff, and grabbed them by the face mask. Defendant Taylor took manhandled Plaintiff until they broke away and managed to stagger a few feet away.

49. Defendant Taylor then maliciously sprayed Plaintiff with a high volume of pepper spray, causing them pain and injury. *See* Figure No. 1., circle in yellow.



50. Despite using intermediate force which would require the existence of enough probable cause at the time of force to justify an arrest for a serious felony, Defendant Taylor did not attempt to arrest Plaintiff. Defendant Taylor only wanted to cause Plaintiff pain and suffering.

51. Defendant Taylor is a notorious riot police officer on the Rapid Response Team. His actions on the night of June 30, 2020, by unlawfully shooting protesters with an FN303, led to the City of Portland being in held in contempt of a federal court order in the *Don't Shoot Portland, et al v. City of Portland* case.

52. At the Show Cause regarding the City's contempt, Defendant Taylor testified that he fired his FN303 weapon "40 to 60" times within just a few hours on June 30. Videos from June 30, 2020, depict Brent Taylor frequently firing multiple rapid shots into the crowd.

53. Defendant Taylor had justified his use of force because of his animus for anyone he believed was an "anarchist" or "protester." Mr. Taylor told the court that:

> "If we have a crowd out there, like on every Friday, marching through the street with their families and their kids, you know, talking about issues like that, that's one thing.

> But when we have a group of, quite frankly, anarchists, protesters, who have engaged in nightly burning and violence, then it is a daily consideration for us, that what is that banner, what is that sign, or what is that shield constructed of?"

54. Defendant Taylor's belief that he can exact punishment based on perceived political affiliations does not comport with the Constitution or state law.

55. Despite Defendant Taylor's conduct resulted in the City being held in contempt, the City did not discipline him, continuing their pattern of allowing lawless behavior amongst their police officers.

56. Despite Defendant Brent Taylor having committed a felony of criminal Assault in the Second Degree (ORS 163.175) in plain view of the other officers on numerous occasions that night, including against Plaintiff, none of the other PPB officers intervened or arrested Defendant Taylor. This is in accordance with the PPB pattern, practice, and/or custom to excuse the constitutional violations and criminal actions of their own, encourage violence amongst their members while at protests, and flagrantly violate constitutional rights while at protests.

57. In attacking Plaintiff, the officer caused them physical and emotional harm. Plaintiff has suffered serious emotional trauma, and developed an eating disorder because of Defendant Taylor's conduct that night.

**Claim 1: First Amendment — Unlawful Retaliation Against Speech — Individual Liability (42 U.S.C. § 1983)**

58. As described above, Defendant targeted Plaintiff for injury not because they had probable cause to use intermediate force, but because they took offense to Plaintiff's speech activity.

59. The First Amendment protects persons from unlawful curtailment of expressive conduct, assembly, and associations with one another.

60. Defendant Taylor's retaliatory motive was the but-for cause of Plaintiff's injuries. By having attacked and injuring Plaintiff, Defendant chilled Plaintiff's political speech, violating their First Amendment rights.

61. Defendant Taylor's actions, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of his intentional conduct, Plaintiff is entitled to punitive damages against Defendant Taylor, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

62. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, eating disorder, continued need for mental health treatment, medical bills, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of their damages in an amount to be ascertained according to proof at trial.

**Claim 2: First Amendment – Unlawful Pattern and Practice – Municipal Liability
(42 U.S.C. § 1983)**

63. As explained in Claim 1, Defendant Taylor violated Plaintiff's constitutional speech rights.

64. Defendant Taylor's conduct, and the conduct alleged in the above paragraphs, is illustrative of a pattern and practice of PPB officers violating the First Amendment rights of individuals at protest demonstrations against police misconduct. Defendant City of Portland has a custom and practice of using militarized force against left-wing or antifascist protestors. Defendants' past Fourth and First Amendment violations were intended to punish a group of protestors *en masse* for their political speech. Defendant City of Portland does not use such tactics against right-wing protestors or fascist protestors, such as the Proud Boys or Patriot

Prayer, despite their disobedience of officers' orders and clear intent to terrorize the community of Portlanders.

65. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, eating disorder, continued need for mental health treatment, medical bills, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of their damages in an amount to be ascertained according to proof at trial.

### Claim 3: Fourth Amendment – Unlawful Seizure – Individual Liability
### (42 U.S.C. § 1983)

66. It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

67. In taking the actions described above, including but not limited to battering and pepper spraying a nonthreatening, injured person, Defendant Taylor intentionally violated Plaintiff's right to be free from unlawful seizures guaranteed by the Fourth Amendment to the United States Constitution.

68. Defendant Taylor violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to Taylor could have believed that his or her conduct was lawful or within the bounds of reasonable discretion. Defendant Taylor therefore does not have qualified or statutory immunity from suit or liability.

69. The actions of Defendant Taylor, as described in this complaint, was malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendant Taylor, in their individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

70. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, eating disorder, continued need for mental health treatment, medical bills, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of their damages in an amount to be ascertained according to proof at trial.

**Claim 4: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability**
**(42 U.S.C. § 1983)**

71. As described in Claim 3, Defendant Taylor violated Plaintiff's constitutional right to be free from unlawful seizures.

72. Defendant Taylor's conduct is illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights individuals at protest demonstrations countering white supremacist groups and/or police misconduct.

73. Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of unlawful actions by PPB officers in a timely or effective fashion, and rarely categorizes such unlawful seizures as out of policy even when the force is clearly excessive or when the arrest was without sufficient legal justification. Defendant John Doe 1 received inadequate training, supervision, and/or discipline for violating the U.S. Constitution. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct constitutional violations by officers throughout the PPB.

74. Defendants City of Portland failed to train and discipline its officers, including Defendant Taylor, to follow the protections against these types of police and government repression and retaliation that have been recognized under the U.S. Constitution, as described above. As a result, Defendant Taylor engaged in unconstitutional conduct that resulted in harm to Plaintiff.

75. The excessive force against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, eating disorder, continued need for mental health treatment, medical bills,

mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of their damages in an amount to be ascertained according to proof at trial.

### Claim 5: Fourteenth Amendment – Due Process
### (42 U.S.C. § 1983)

76. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

77. Defendant Taylor intentionally and unlawfully shoved, beat, and pepper sprayed Plaintiff and did not provide the Plaintiff any warning or notice of this attack.

78. Plaintiff posed no threat to the officer and was injured. The officer did not attempt to arrest the Plaintiff and did not take them into custody after the attack, depriving them of their liberty without the due process required by the Constitution, violating their rights.

79. The actions of Defendant Taylor, as described in this complaint, was malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendant, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

80. Defendants City are liable for under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

81. Defendants' unconstitutional acts against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, continued need for mental health treatment, medical bills, worry, fear, and anguish. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

### REASONABLE ATTORNEY'S FEES AND COSTS

82. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

83. Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    A.    For economic and non-economic damages in an amount to be determined at trial;

    B.    For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    C.    Such other relief as the court deems just and proper.

DATED: August 15, 2022.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Franz Bruggemeier*
Franz Bruggemeier, OSB #163533
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Jonathan Gersten*
Jonathan Gersten, OSB # 191582
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*